# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Facebook account "Erica Gilpin" with URL<br>https://www.facebook.com/erksmirk | Case No.  '22 MJ1456 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC sec. 952, 960, 963 | Conspiracy to Import Controlled Substances, Importation of Controlled Substs |
| 31 USC sec. 532 | Bulk Cash Smuggling |

The application is based on these facts:
See Attached Affidavit of HSI Special Agent Dante Reynolds, incorporated herein by reference.

☐ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Dante J. Reynolds*
*Applicant's signature*

Special Agent Dante Reynolds, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone__ *(specify reliable electronic means)*.

*Allison H. Goddard*
*Judge's signature*

Date: 04/26/2022

City and state: San Diego, California      Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Dante Reynolds, a Special Agent with Homeland Security Investigations ("HSI"), being duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with the following Facebook account, as described in Attachment A: Facebook account "Erica Gilpin " with URL https://www.facebook.com/erksmirk (the "**Target Account**"), which is stored at premises owned, maintained, controlled or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.

2. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to records and other information in its possession, pertaining to the subscriber or customer associated with the **Target Account**.

3. I seek authority to search the **Target Account** for evidence of violations of Conspiracy to Import Controlled Substances under 21 U.S.C. §§ 952, 960, and 963, Importation of Controlled Substances under 21 U.S.C. §§ 952 and 960, and Bulk Cash Smuggling under 31 U.S.C. § 5332, as described more fully in Attachment B, incorporated herein by reference.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for search warrants, it does not set forth every fact that others or I have learned during the course of this investigation. Dates, times, and amounts are approximate.

## TRAINING AND EXPERIENCE

5. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since July 2017. I am currently assigned to the HSI Office of the Deputy Special Agent in Charge (DSAC), in San Diego, California. I am a graduate of the

1

Criminal Investigator Training Program (CITP) and the HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Prior to my tenure with HSI, I was employed by the U.S. Border Patrol (USBP) and the Federal Air Marshal Service (FAMS); I have been serving as a federal Law Enforcement Officer (LEO) continuously since May 1998. I have also attended courses on searching and reviewing electronic devices and social media, some of which were presented by the California Narcotics Officers Association (CNOA), in December 2018.

6. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry (POE).

7. I have become familiar with Facebook and other social media sites through my investigations. I have examined many Facebook profile pages and I have learned that suspects often use social media sites for communications in an effort to bypass law enforcements attempts to uncover their criminal activity. Based on my training, experience, and communications with other law enforcement officers, I have learned specific techniques in being able to identify suspects and associates even when they use fictitious names or aliases within social media sites.

8. During the course of my law enforcement career, I have been involved in investigations of numerous criminal offenses, including those offenses related to this current investigation. I have participated in numerous investigations of illicit drug trafficking organizations, and these investigations have included the use of confidential sources; undercover agents; the analysis of pen register, trap and trace, and toll records; physical surveillance; and the execution of arrest and search warrants.

2

confidential sources; undercover agents; the analysis of pen register, trap and trace, and toll records; physical surveillance; and the execution of arrest and search warrants. These investigations have also included the unlawful importation, possession with intent to distribute, and the distribution of controlled substances, the related laundering of monetary instruments, and conspiracies associated with criminal narcotics offenses. These investigations have resulted in prosecutions of individuals who have possessed, imported, or distributed controlled substances, including cocaine, heroin, methamphetamine, marijuana, and fentanyl, as well as the seizure of those illegal drugs and the proceeds from the sale of those illegal drugs.

9. Based upon my training and experience as a law enforcement officer, and consultations with law enforcement officers experienced in drug smuggling investigations, I am also aware that:

   a. Drug traffickers will use social networking and messaging services on different electronic devices because it allows access to send instant messages and communicate with other individuals in addition to the standard use of cellular phones to make telephone calls, text, web, and voice messages;

   b. Drug traffickers will use social networking and messaging services because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

   c. Drug traffickers and their accomplices will use social networking and messaging services features because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

   d. Drug traffickers will use social networking and messaging services to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

   e. Drug traffickers will use social networking and messaging services to notify or warn their accomplices of law enforcement activity to include the presence

   and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings; and

  f. The use of social networking and messaging services by smugglers tends to generate evidence that is stored on the social media account, including, but not limited to chats, instant messages, photographs, contact lists, IP addresses, connected social network accounts, and location data.

## PROBABLE CAUSE

10. According to the report of CBP Officer Ronquillo, on June 30, 2021, the Officer was conducting pre-primary inspections at the San Ysidro Port of Entry, with a K-9 Unit. At about 6:40 p.m., the Officer came across a 2000 tan Ford Explorer with Washington license plates (WA-BTT2526), being driven by Brian GILPIN. Erica GILPIN was in the front passenger seat, and was the only other occupant of the car. The Officer's K-9 Unit sniffed the Ford Explorer and alerted on the spare tire. At that point, the Officer alerted CBP Officer Garcia, who removed Brian from the car.

11. According to the report of CBP Officer Garcia, at about 6:45 p.m. on June 30, Officer Garcia received an alert from Officer Ronquillo, who was seeking assistance on Lane 27 at the Port of Entry. Officer Garcia responded and made contact with Brian. Brian gave Officer Garcia two negative declarations, and said that he was going to San Diego and visiting from Washington. Officer Garcia scanned the spare tire with his Buster Contraband Detector, and found (per the detector) that the density of the spare tire was anomalously high. (In other words, the density of the tire was higher than it would be if it contained air.) Officer Garcia removed Brian from the Ford Explorer, placed him in handcuffs, and escorted him to the security office.

12. Per the report of CBP Officer Ortega, at about 6:45 p.m., the Officer scanned the Ford Explorer in the "Z-Portal" X-Ray machine. The Officer saw anomalies in the spare tire and the rear, passenger-side quarter panel.

13. Per the report of CBP Officer McDonald, at about 7:45 p.m., the Officer was

4

assigned to conduct a physical inspection of the Ford Explorer. The Officer found five packages hidden in the rear passenger quarter panel. The Officer also removed the spare tire from the car and found fifteen additional packages in it. The Officer conducted presumptive testing on the contents of the packages, which was a white powdery substance, and found it tested presumptively positive as cocaine. Subsequently, DEA lab testing confirmed that the packages contained about 10 kilograms of cocaine. The Officer placed Brian and Erica under arrest.

14. I responded to the Port of Entry to interview Brian and Erica, who both received and waived their *Miranda* rights. In their post-arrest interviews, both Brian and Erica denied knowing that drugs had been hidden in the Ford Explorer. Brian told me that the people he had been staying with in Mexico had stolen the car and had it for about two weeks. He claimed that he had stolen it back from them a week prior, and that he was the only person who had controlled the car for the prior week. He also told me that a man named Oscar had hired him to pick up money in the United States and bring it to Mexico. He also said that he thought he was picking up $26,000, and was to be paid $3,000. Erica told me that a compartment had been installed in their car, and that they were supposed to pick up $30,000 in San Diego and bring it to Mexico. She also said that the people whom they were staying with had held their car for two weeks, and identified Oscar as the person who hired them.

15. Brian and Erica were charged with importation of controlled substances in violation of 21 U.S.C. §§ 952 and 960. In April 2022, a grand jury returned an indictment against them for this charge, and for conspiring to import controlled substance in violation of 21 U.S.C. §§ 952, 960, and 963.

16. In the course of this matter, the Government has come into possession of a limited set of messages that Erica sent over the **Target Account**. As a threshold matter, I have reviewed the "screen shot" of the images, which are accompanied by a photograph that I recognize as one of Erica and Brian, together with a juvenile whom

I assume is a child of theirs. I also have gone on Facebook and conducted a search for "Erica Gilpin" and found the **Target Account**, which bears the same picture. I know what Erica looks like from my post-arrest interview, and recognize her in this photo.

17. On June 21, at 9:09 p.m., Erica sent a Facebook message from the **Target Account** to a third party that said, "Working with that Anthony guy but please don't say anything… got the truck running finally and the papers from Oscar." In a subsequent message apparently sent at the same time, she wrote, "They are going to fix the window tomorrow and then we will go to San Diego for the money pickup to get paid ;) hopefully it all works out good." From my training and experience, I am aware that people who participate in bulk cash smuggling for drug trafficking organizations cross the border into San Diego to pick up the cash, often hiding it in cars and smuggling it over the border for the benefit of the trafficking organizations seeking to recoup their profits. Here, I infer that when Erica referred to "the money pickup to get paid," she was suggesting to the third party that she was going to conduct bulk cash smuggling. I further note that per TECS crossing records, on June 23, Brian drove into the United States in the Ford Explorer. (Erica, it appears, did not.)

18. In light of my training and experience, I believe that the foregoing statement by Erica is plausible evidence of participation in cross-border smuggling activity. The statement is, on its face, consistent with efforts to conduct bulk cash smuggling. I am aware that such activity is both a crime itself, and evidence of participation in a drug-smuggling conspiracy; the purpose of the smuggling, I am aware, is generally to assist Mexico-based traffickers in efforts to obtain their profits from drug trafficking. To be sure, nothing in the statement suggests that Erica (or Brian) were only engaged in bulk cash smuggling, and nothing in my affidavit should be understood to suggest that their activity was so limited. But insofar as Erica used the **Target Account** to make a statement tending to bear upon her participation in cross-border smuggling, I submit that a search of the **Target Account** is likely to reveal a fuller understanding of that activity.

19.     From my training and experience, I know that participants in drug smuggling conspiracies will communicate in the days and weeks leading up to smuggling activity.[1] These conversations can include planning and coordination, discussions of payment, logistics, and other matters pertaining to the smuggling of drugs and cash proceeds over the border between the United States and Mexico. I am also aware that when a conspirator is arrested, co-conspirators do not always become aware of the arrest immediately, and can seek to communicate with the arrested conspirator about the activity. In light of this, I seek authority to search the **Target Account** for materials falling within the scope of Attachment B over the date range of January 1 through July 31, 2021.

### BACKGROUND INFORMATION ON FACEBOOK

20.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

21.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

22.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly

---

[1] On April 22, 2022, the Government submitted a preservation request to Facebook for the **Target Account**, for the date range of January 1 through December 31, 2021.

with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

23. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

24. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall", which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

25. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or

8

video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

26.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

27.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

28.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

29.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

30.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.

The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

31. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services.

32. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

33. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

34. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

35. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

36. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP

10

address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

37. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

38. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts

along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and event relating to the crime under investigation. Additionally, Facebook builds geolocation into some of its services. Geolocation allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indication a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

39. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PRIOR ATTEMPTS TO OBTAIN DATA**

40. The United States has not attempted to obtain this data by other means.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

41. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook (hereinafter "the internet service provider" or "the ISP") are not. It would be inappropriate and impractical for federal agents to search the vast computer network of the ISP for the relevant accounts and then to analyze the contents of those accounts on the premises of the ISP. The impact on the ISP's business would be severe.

42. Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Facebook accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of the ISP, to protect the privacy of the ISP's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the Federal Bureau of Investigation seeks authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure. The copies will be provided to me or to any authorized federal agent. The copies will be imaged, and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

43. Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. The ISP does not always organize the electronic files they provide chronologically, which makes review even more time

consuming and may also require the examiner to review each page or record for responsive material.

44. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis and within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

45. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

46. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation and extraction of data within the scope of this warrant.

//
//
//
//
//
//
//
//
//

14

# CONCLUSION

47. Based on the foregoing, I submit that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of Conspiracy to Import Controlled Substances under 21 U.S.C. §§ 952, 960, and 963, Importation of Controlled Substances under 21 U.S.C. §§ 952 and 960, and Bulk Cash Smuggling under 31 U.S.C. § 5332, and will be found in the accounts to be searched as provided in Attachment A.

I declare under penalty and perjury the foregoing is true and correct to the best of my knowledge and belief.

*Dante J. Reynolds*
Special Agent Dante Reynolds
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 26th day of April, 2022.

*Allison H. Goddard*
Honorable Allison H. Goddard
U.S. Magistrate Judge

# Attachment A
## DESCRIPTION OF LOCATION TO BE SEARCHED

This warrant applies to information associated with the following account, which is stored at premises owned, maintained, controlled, or operated by Facebook, 1601 Willow Road, Menlo Park, California 94025: Facebook account "Erica Gilpin " with URL https://www.facebook.com/erksmirk (the "**Target Account**").

# ATTACHMENT B
# DESCRIPTION OF ITEMS TO BE SEIZED

**I.      Service of Warrant**

The officer executing the warrants shall permit Facebook, Inc., as custodian of the computer files described in Section II below, to locate the files relevant to Attachment A, incorporated herein, and copy them onto removable electronic storage media and deliver the same to the officer or agent in the manner set forth in the Affidavit, incorporated herein.

**II.     Items subject to seizure**

All subscriber and/or user information, all electronic mail, images, text messages, histories, phone and VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account and screen name: Facebook account "Erica Gilpin " with URL https://www.facebook.com/erksmirk (the "**Target Account**").

**III.    Search**

The search of the data supplied by Facebook pursuant to these warrants will be conducted by HSI as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of these search warrants and will be limited to the period of January 1, 2021 through July 31, 2021, and to the seizure of:

    a.   Communications, records, and attachments tending to discuss or establish a conspiracy to import controlled substances, the importation of controlled substances, and bulk cash smuggling;

    b.   Electronic mail, text or instant messages, posts, profiles information, and attachments tending to discuss or establish conspiracy to import controlled substances, the importation of controlled substances, and bulk cash smuggling;

  c. Communications, records, and attachments tending to identify the user of the **Target Account** and any co-conspirators involved in the activities in III(a) above; and

  d. Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the **Target Account**;

which are evidence of violations of Conspiracy to Import Controlled Substances under 21 U.S.C. §§ 952, 960, and 963, Importation of Controlled Substances under 21 U.S.C. §§ 952 and 960, and Bulk Cash Smuggling under 31 U.S.C. § 5332.